**William T. BOLIEK, Petitioner,**

v.

**Paul DELO, Respondent.**

No. 89–4076–CV–C–5.

United States District Court,
W.D. Missouri,
Central Division.

Dec. 13, 1995.

**1202**

David J. DeSimone, DeSimone & Pearson, Kansas City, MO, for petitioner.

Stephen D. Hawke, Attorney General's Office, Jefferson City, MO, for respondent.

### ORDER

SCOTT O. WRIGHT, Senior District Judge.

This petition for writ of habeas corpus was filed pursuant to 28 U.S.C. § 2254 by William T. Boliek (petitioner), an inmate in custody at Potosi Correctional Center, Potosi, Missouri. The petitioner seeks to vacate his death sentence entered by the trial court after a conviction for capital murder. The conviction and sentence were affirmed on direct appeal.

State v. Boliek, 706 S.W.2d 847 (Mo.1986) (en banc) cert. denied, 479 U.S. 903, 107 S.Ct. 302, 93 L.Ed.2d 276 (1986). Petitioner then filed a Missouri Rule 27.26 petition in Circuit Court. His request for post-conviction relief was denied, and the denial was affirmed on appeal. Boliek v. State, 755 S.W.2d 417 (Mo. Ct.App.1988) cert. denied, 489 U.S. 1040, 109 S.Ct. 1175, 103 L.Ed.2d 237 (1989).

Movant's petition contains thirteen claims. The facts relevant to each claim will be outlined as necessary. For the reasons set forth below, the petition for writ of habeas corpus is granted and the sentence of death is vacated.

### Analysis

#### I. Mitigating Evidence

Petitioner contends that his trial counsel's failure to investigate and to introduce mitigating evidence during the penalty phase of the trial constituted ineffective assistance of counsel. Specifically, petitioner argues that the following mitigating evidence was available but was not utilized by his counsel: evidence of troubled and sickly childhood including influence of an alcoholic father, learning disabilities, problems with social development, history of psychological and psychiatric problems, severe alcohol and drug abuse, head trauma, lack of previous violent crimes, heavy drug and alcohol use before the victim's death, heavy stress before the victim's death, and a "siege" mentality shortly before the victim's death.

Respondent, however, argues that counsel's performance during the sentencing phase was not constitutionally deficient and further asserts that petitioner's claim is procedurally barred.

#### A. Procedural Bar

It is undisputed that petitioner did not raise this ineffective assistance of trial counsel claim before the Rule 27.26[1] trial court. As a result, the issue is procedurally barred. Wainwright v. Sykes, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1977). A procedural bar, however, may be lifted if a

---

1. Rule 27.26 was repealed effective January 1, 1988, by order of the Supreme court of Missouri. Now post-conviction actions in Missouri are governed by Rule 29.15.

petitioner who has failed to develop evidence in state court can show "cause and prejudice" for the failure. *Parkus v. Delo,* 33 F.3d 933, 938 (8th Cir.1994) (citations omitted). "The existence of cause for a procedural default 'ordinarily turn[s] on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule.'" *Id.* (quoting *Murray v. Carrier,* 477 U.S. 478, 488, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986)). "A petitioner may demonstrate an objective impediment to compliance with a procedural rule by showing that the factual or legal basis for a claim was not reasonably available to counsel, or that some interference by officials made compliance impracticable." *Id.* (internal citations and quotation marks omitted); *McCleskey v. Zant,* 499 U.S. 467, 494–95, 111 S.Ct. 1454, 1470, 113 L.Ed.2d 517 (1991).

■ A review of petitioner's Rule 27.26 proceeding reveals that interference by the 27.26 court provided an objective impediment to presentment of the ineffective assistance claim. Some background is necessary to address this point. On November 7, 1986, petitioner filed a pro se motion for relief under Rule 27.26. He raised one claim of ineffective assistance of trial counsel. Pursuant to Rule 27.26(h), the court appointed Mr. James W. Drese to represent petitioner in the 27.26 proceeding. Drese was a contract public defender who later surrendered his license to practice law upon order of the Missouri Supreme Court.[2] Although Rule 27.26(h) creates a duty for appointed counsel to "ascertain from the prisoner whether he has included all grounds known to the prisoner as a basis for attacking the judgment and sentence and to amend the motion to include any claims not already included," Drese failed to confer with petitioner and failed to amend the pro se motion prior to the hearing. (*See* 27.26 Tr.).

At petitioner's request, Drese asked the court for a continuance of the 27.26 hearing so that he could file an amended motion and raise additional claims. The court eventually granted the continuance, but then forced petitioner to immediately, without assistance of counsel, offer all grounds he intended to raise in the amended petition. The court stated:

> I want you to tell me now … in what other ways Mr. Sterling [petitioner's trial counsel] was ineffective in assisting. [sic] I want to hear every complaint you have against Mr. Sterling right now … so we don't have to plow this ground again on February 10th. Now tell me what else you have a complaint about. (27.26 Tr. at 24).

Even though petitioner had not conferred with, or had not received assistance from Drese, petitioner stated nine additional ways he felt his trial counsel had provided ineffective assistance.

The court then banned petitioner and counsel from investigating or adding any more claims to the petition, stating:

> You may amend your pleadings to include everything he's [petitioner] raised today, but you can't raise new items. That's right, because I want that exhausted today. Mr. Boliek is prepared, I assume, to testify to that because that's what he alleged and that's what we came here today for. That's what this hearing was for. He wants to expand it and I'm going to permit him to do that but I'm not going to let him come back on the tenth and start all over this again, or add to the allegations of what Sterling did. Now what Mr. Sterling did at that time of trial, he's known that since the date of trial and he either knows it now or doesn't. And going back and talking to Doyle Williams [inmate who assisted petitioner in preparing his *pro se* direct appeal brief and his *pro se* 27.26 petition] is not going to help. That's what I'm trying to prevent. Do you understand that? (27.26 Tr. at 30).

Drese complied with the court's directive and filed an amended petition containing only

---

2. On October 15, 1987, a hearing was held by the Advisory Committee of the Missouri Bar Administration on several disciplinary charges that had been filed against Drese. The charges included neglect of clients and failure to appear at court proceedings. Drese filed a Motion to Surrender License and the Missouri Supreme Court, by order, accepted it April 19, 1988. (Pet'r Ex. 15 and 16).

those complaints articulated by petitioner at the first 27.26 hearing. As a result, his claim that trial counsel provided ineffective assistance by failing to present mitigating evidence at sentencing was omitted. The transcript excerpt clearly illustrates that the decision to forego adding this claim was not a "tactical" or "intentional" decision. *Amadeo v. Zant,* 486 U.S. 214, 215, 108 S.Ct. 1771, 1773, 100 L.Ed.2d 249 (1988).

Respondent argues that it was Drese who failed petitioner because he did not meet with him or timely amend his petition. The 27.26 court, however, had discretion to allow counsel more time to investigate claims or at least time to amend and add legal claims assessed and formulated by counsel. The court's actions instead violated well-established Missouri principles and resulted in petitioner being denied any forum in which to present his ineffective assistance of counsel claims. The court's actions made compliance with Missouri's Rule 27.26 impracticable if not impossible.

First, the court forced petitioner to continue to act pro se. Although appointed counsel wrote the amended petition, the only assistance petitioner received in formulating the legal claims came from inmate Doyle Williams. The resulting legal claims were, in effect, pro se.

Ironically, the Missouri Supreme Court adopted a per se rule for the appointment of counsel in 27.26 proceedings to prevent such unexhaustive, pro se filings. *See Fields v. State,* 572 S.W.2d 477 (Mo.1978) (en banc). The court acknowledged that nearly all motions to vacate under Rule 27.26 were filed without assistance of counsel and that prisoners were often aided by jailhouse lawyers. *Id.* at 482. The court stated, "the proper agent to assist the court in the search to determine whether a claimed ground for relief is meritorious and deserving of relief or not meritorious or perhaps even frivolous is an attorney, appointed pursuant to rule 27.26(h)." *Id.* The court correctly observed that "assistance of counsel in preparing and filing an amended motion adequately stating all issues involved ... would make much easier the task of the trial and appellate courts in resolving the questions involved."

*Id.* (citations and quotation marks omitted). "Additionally, an attorney is able by training and experience to ask probing questions and thereby elicit important information which the petitioner might otherwise fail to disclose through ignorance." *Id.* at n. 3.

It is absurd to expect an inmate to have the ability to assess his own trial and to present "all grounds known" regarding the complex issue of ineffective assistance of counsel. *See Gunn v. Newsome,* 881 F.2d 949, 961 (11th Cir.1989) (quoting *Price v. Johnston,* 334 U.S. 266, 292, 68 S.Ct. 1049, 1063, 92 L.Ed. 1356 (1948) (because inmates "are often unlearned in the law ... we do not impose on them the same high standards of the legal art which we might place on members of the legal profession")); *Nell v. James,* 811 F.2d 100, 105 (2nd Cir.1987). A denial of a 27.26 motion is a foregone conclusion once a trial court considers it without amendment. *Young v. State,* 724 S.W.2d 326, 327–28 (Mo.Ct.App.1987).

Next, the court prevented Drese from carrying out his professional duty and his duty prescribed by Rule 27.26. Pursuant to 27.26(h), "counsel shall have the duty to ascertain from the prisoner whether he has included all grounds known to the prisoner as a basis for attacking the judgment and sentence and to amend the motion to include any claims not already included." The 27.26 transcript reveals that the court prevented counsel from complying with Missouri's Rule. In addition, Drese was not given time to meet with petitioner to discuss his claims as required by prevailing professional norms. *See* Terry Daley, *A Guide For Appointed counsel For Indigent Movants Under Rule 27.26,* J.Mo.Bar 41, 43 (1981).

Further, if counsel was not complying with the court's rules and was improperly representing petitioner, the court should have removed him and appointed a new attorney. *See Chunn v. State,* 869 S.W.2d 326 (Mo.Ct.App.1994). In *Chunn,* the court reviewed an order dismissing, without notice or hearing, a 27.26 proceeding. *Id.* Several attorneys had been appointed, but none had amended petitioner's pro se motion. *Id.* at 327. As a result, the trial court dismissed the petition for failure to prosecute. *Id.* The reviewing

court, after examining the Rule 27.26(h) modern counterpart, Rule 29.15(e), stated that if a court "finds that the failure to file the amended motion is the fault of counsel, the court shall appoint new counsel and shall allow time to file an amended motion." *Id.* (citing *State v. Bradley,* 811 S.W.2d 379, 385 (Mo.1991) (en banc); *Luleff v. State,* 807 S.W.2d 495 (Mo.1991) (en banc); *Sanders v. State,* 807 S.W.2d 493, 495 (Mo.1991) (en banc); *Soto v. State,* 813 S.W.2d 126 (Mo.Ct. App.1991)).

Although not directly on point, *Chunn* highlights the importance of the assistance of counsel in formulating 27.26 legal claims. *See also Young v. State,* 724 S.W.2d 326, 327 (Mo.Ct.App.1987) (Rule 27.26 procedure is essential to proper administration of justice). Moreover, *Chunn* stands for the proposition that it is improper to penalize a petitioner for an attorney's failure, especially when such failure bars forever the review of a claim. The *Chunn* case places the responsibility on 27.26 courts to give inmates the opportunity to file 27.26 petitions with "all grounds known."

A Missouri court in *Young v. State* further highlighted these principles. 724 S.W.2d 326 (Mo.Ct.App.1987). Young's appointed counsel was granted two consecutive thirty-day continuances to amend the pro se 27.26 petition. When counsel again failed to amend the petition, the trial court ruled on the pro se motion without a hearing. *Id.* at 327. The reviewing court found that although sixty days was a "reasonable time" as contemplated by Rule 27.26(h) and that appointed counsel failed to meet her obligation, the trial court had still abused its discretion in ruling on the motion. *Id.* The court stated:

> Counsel here was appointed by the court. She was the court's choice to ensure movant's rights were properly exercised, in particular, to amend the pro se motion if necessary. It is incongruous, to say the least, to choose counsel for movant and then penalize the movant because counsel did not fulfill the duty she was chosen for. In effect, movant's rights were extinguished without meaningful consideration because of the court's choice and not due

to any apparent fault of movant. *Id.* at 328.

In this case, petitioner's 27.26 court not only "did not properly protect [his] rights" but went further by actually prohibiting him from properly presenting his claims. *Id.* at 327. As a result, the court's actions clearly constituted "interference by officials [which] made compliance [with Rule 27.26] impracticable." *Parkus v. Delo,* 33 F.3d 933, 938 (8th Cir.1994) (quoting *Murray,* 477 U.S. at 488, 106 S.Ct. at 2645 (internal citation and quotation marks omitted)).

The second element that must be satisfied before a procedural bar may be lifted is prejudice. The prejudice in this case is obvious. Movant was prevented from raising a meritorious ineffective assistance of counsel claim. The following analysis will more fully outline the prejudice suffered by petitioner.

## B. Merits

Because the procedural bar is now properly lifted, this Court will turn to the merits of petitioner's ineffective assistance of counsel claim. In order to receive relief on an ineffective assistance of counsel claim, petitioner must show that his counsel's performance was constitutionally ineffective and that counsel's performance resulted in prejudice. *Kenley v. Armontrout,* 937 F.2d 1298, 1303 (8th Cir.1991) (citations omitted). Performance will be judged "based on an objective standard of what would be considered reasonably effective performance in the circumstances of a particular criminal proceeding." *Id.*

Petitioner argues that trial counsel's performance fell far below an objective standard of effectiveness due to his failure to investigate mitigating factors relevant to the sentencing phase. This Court agrees.

"The Supreme Court requires that counsel make a reasonable investigation in the preparation of a case or make a reasonable decision not to conduct a particular investigation." *Id.* at 1304 (citing *Strickland v. Washington,* 466 U.S. 668, 691, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984)). The Eighth Circuit has held that there is no presumption in favor of counsel's effective-

ness if counsel did not "exercise reasonable diligence to produce exculpatory evidence and strategy resulting from lack of diligence in preparation and investigation...." *Id.* (citations omitted). In addition, "[c]ounsel's performance may be found ineffective if s/he performs little or no investigation." *Id.* (citations omitted).

When petitioner became Peter Sterling's client, Sterling had never been lead counsel on a capital case before. (Sterling's Depo, Pet'r Ex. 14 at 13 [hereinafter Sterling]). He had assisted another attorney on one capital case but had no real participation. (Sterling at 14). He had no appellate or post-conviction relief experience, and he had no training in capital cases whatsoever. (Sterling at 14). In addition, Sterling had no assistance at any stage of the trial and primarily focused on pretrial motions and the guilt phase. (Sterling at 20, 22, 34).

Preparation for the penalty phase was minimal if not absent. Sterling stated that he may have looked at some background information and that he met with petitioner's mother once for only a couple of hours. (Sterling at 24). He failed, however, to contact any other relatives or friends of petitioner. (Sterling at 25, 37). Sterling testified that he had access to a state psychiatric report, but that the report had been prepared to explore petitioner's mental capacity not mitigating factors. (Sterling at 35). In fact, he said he did not remember considering mental background for mitigation at all. (Sterling at 95). Finally, Sterling testified that because he concentrated solely on the guilt phase, he did not even consider what was available for mitigation (Sterling at 92, 96) even though "[p]retrial preparation ... is, perhaps the most critical stage of a lawyer's preparation." *Magill v. Dugger,* 824 F.2d 879, 886 (11th Cir.1987).

Sterling's performance at trial further demonstrated his total lack of investigation or preparation. Regarding the penalty phase, he later stated in deposition, "I don't think I had any, like, outlines or notes or anything of that nature. It was consistent with my conclusion that, for whatever reason, it wasn't going to be a capital case. I had not put any extensive effort into the mitiga-

tion element." (Sterling at 37). When the verdict was read and Sterling realized that indeed this was a capital case, he was, "shocked, devastated, and panicked" because he had never done a penalty phase before and had not prepared for it. (Sterling at 37–38). The only witness Sterling called to the stand was petitioner's mother. (Sterling at 38). Witness preparation consisted only of a few minutes of conversation, and Sterling had not even attempted to have other witnesses available. (Sterling at 39, 40) *See Elledge v. Dugger,* 823 F.2d 1439, 1445 (11th Cir.1987) (failure to at least interrogate relatives and to seek an expert witness was outside the range of competent assistance).

The Missouri Supreme Court summed up trial counsel's performance when the court wrote, "no mitigating circumstances were submitted to the jury." *State v. Boliek,* 706 S.W.2d 847, 851 (Mo.1986) (en banc). Counsel, in effect, did nothing to prepare himself to present mitigating factors. His decision to forego any investigation did not result from a reasoned tactical decision, but instead arose from incompetence and a lack of experience. Sterling's total failure to investigate obviously fell below an objective standard of effective performance. "One of the primary duties defense counsel owes to his client is the duty to prepare himself adequately prior to trial." *Magill,* 824 F.2d at 886 (11th Cir. 1987). Therefore, Sterling's performance was constitutionally ineffective. *See Kenley,* 937 F.2d at 1304 ("failing to present mitigating evidence may be ineffective assistance if, due to inadequate trial preparation and investigation, counsel has through neglect failed to discover such evidence...." (citation and internal quotes omitted)).

This Court must next address the issue of prejudice. In the death sentence context, a court must determine "whether, but for counsel's deficient performance, there is a reasonable probability the jury would have concluded the balance of the aggravating and mitigating circumstances did not warrant death." *Kenley,* 937 F.2d at 1303. "The ineffective performance must create a reasonable probability that the result of the proceeding is unreliable; the ineffectiveness

must undermine ... confidence in the proceeding." *Id.*

This Court believes that there is a reasonable probability that petitioner would not have received a death sentence if the jury had heard some of the mitigating evidence at trial. None of the mitigating evidence was hidden from counsel. He could have easily spent more time talking to petitioner about his medical, educational, social, and psychological background. Family members were obviously willing to talk and to testify. Petitioner's medical, army, and educational records were readily available—counsel only had to ask for them. Instead, Sterling relinquished his duty and did nothing.

1. Family Background

■ Family background and personal history are properly admissible as mitigating evidence. *Hitchcock v. Dugger,* 481 U.S. 393, 398, 107 S.Ct. 1821, 1824, 95 L.Ed.2d 347 (1987); *Eddings v. Oklahoma,* 455 U.S. 104, 113–16, 102 S.Ct. 869, 876–78, 71 L.Ed.2d 1 (1982). Had petitioner's trial counsel engaged in a reasonable investigation, he would have found that petitioner had a troubled and difficult childhood—information that would have been helpful at the mitigation stage.[3] For example, petitioner was born to Barbara Boliek Bock, and family history shows the birth was the result of a rape. Barbara allowed her brother and sister-in-law, William Senior (William) and Marilyn Boliek (Marilyn) to adopt petitioner and to raise him as their own. The family moved often throughout petitioner's childhood—up to six times during one year. Dr. Magaw, after conducting a pre-trial mental examination, commented that petitioner's frequent childhood moves had contributed to his inability to hold jobs. Petitioner's adopted father was also known to have been an alcoholic.[4]

Petitioner's medical history was also extensive. He was diagnosed with tuberculosis (TB) at age three and was placed in a hospital for at least five months of treatment. Marilyn noticed a personality change at that time including temper tantrums and throwing things. Early signs of hyperactivity led to the use of restraints by the hospital.

School attendance was often sporadic due to absences resulting from a TB relapse, surgery for a broken arm, and a hydrocele operation. Petitioner fell two years behind his classmates and eventually left school with an eighth grade education.

Medical problems plagued petitioner throughout his life. While in the Army he was treated over fifty separate times for various medical complaints and injuries. After leaving the service, he was seen at many Veteran's Administration (VA) hospitals for problems ranging from rashes and hearing loss to tonsillary pharyngitis.

Had trial counsel conducted the most basic of investigations, he would have found a history of head injuries that affected petitioner's behavior. Marilyn testified that at an early age petitioner was struck in the head by a golf ball. He lost consciousness at the time, and after the incident he would pass out, have nervous spells, and seizures. In 1980, petitioner suffered another head trauma. He was hospitalized at Ozark Medical Center, and where it was observed that petitioner lost consciousness and had seizures. The family reported that after the incident, petitioner acted strangely and began having twitching and jerking spells.

2. Drug Abuse

■ Documented alcohol and drug problems can be probative mitigating evidence. *Kenley,* 937 F.2d at 1308. Petitioner's long

---

**3.** Much of the background and record information was summarized by petitioner's counsel. (Pet'r Ex. 7). The summary was prepared by consulting school, hospital, doctor, pharmacy, psychiatric, military, court, and prison records. Counsel also used summaries of interviews with Marilyn Boliek, letters written by Marilyn to Mary Hudson at the public defender's office, information from petitioner, and information from Beverly Taylor an investigator at the Capital Punishment Resource Center. (Pet'r Ex. 8).

Respondent has not challenged the summary or the facts contained therein.

**4.** VA hospital records showed that William was drunk and belligerent while petitioner was being admitted to a psychiatric ward. Also a 1980 pretrial examination report written by Dr. Magaw reported that petitioner had been raised in an unstable family and that his father was a severe alcoholic.

history of drug abuse was especially crucial at the mitigation stage in light of testimony that he had been using large amounts of drugs and alcohol before and during the death of Jody Harless. Evidence of drug use also might have convinced a jury that petitioner was under the influence of a "siege" mentality at the time of the murder. Marilyn stated that movant began using drugs around the ages of 15 to 16. He was court-martialed for possession of marijuana while in the service. Doctors throughout petitioner's life documented drug and alcohol abuse, and he was hospitalized in 1976 for drug abuse.

### 3. Mental Disorders

■ Emotional problems and mental disorders are certainly essential mitigating factors to be presented during a penalty phase. *See Eddings,* 455 U.S. at 113–16, 102 S.Ct. at 876–78. Petitioner had a long, well-documented history of problems that should have been heard by the jury. In July of 1975, while still in the Army, petitioner was given a mental examination due to unprovoked episodes of violent and sudden outbursts. Dr. Morrell diagnosed him as having a character disorder, aggressive personality, and a drug abuse problem. After leaving the service, he was seen at least twice at the Fresno VA hospital for medical problems including sleeping problems and nervous anxiety.

In 1976, Dr. Mooney examined petitioner and diagnosed him as being an emotionally unstable personality with moderate anxiety and hyperventilation. The mental problems continued to plague him, and on October 15, 1977, petitioner's employer called Dr. Carhart requesting that petitioner be placed on medication to help his nervous condition and shaking. Petitioner's parents stated that two other employees witnessed some of his seizures.

Upon advice of the Chief of Police of West Plains, Missouri, petitioner voluntarily admitted himself as an inpatient to the acute psychiatric ward of Farmington State Hospital to help determine why he shoplifted without

reason or need. He was treated for seven days and was diagnosed as having a cyclothymic personality disorder and drug dependence on synthetic analgesics with morphine-like effects. After being arrested for burglary in 1979, petitioner was admitted to Farmington again for a pre-trial examination. Dr. Parwatikar diagnosed him as having dyssocial behavior and multiple drug dependence after only one day of evaluation. Mr. Pace, a Clinical Psychologist II, also examined petitioner. He reported that petitioner had attempted suicide on two to three occasions. His impressions were that petitioner was displaying a histrionic personality, had a history of drug abuse, and was exhibiting a dyssocial reaction due to long-term drug dependence. Mr. Pace also commented that "[p]ersons with [petitioner's] type of profile tend to be rather evenly divided by neurotic and psychotic diagnosis. If neurotic, they tend to be obsessive compulsive, depressive or often showing mixed forms. Depression and introversion tend to be dominant clinical features with worrying, irritability, nervousness, apathy and social withdrawal."

After the second head trauma in 1980, petitioner was transferred to St. John's Hospital where he was treated by Dr. Klinkerfuss. The doctor diagnosed petitioner as having a personality disorder and a history of head trauma.

Petitioner was arrested again in August of 1980 for burglary and was given a pre-trial mental examination by Dr. Magaw. Dr. Magaw surveyed previous medical records and reported that petitioner had been placed on psychotropic medications while in grade school and was given an early discharge from the Army due to psychiatric problems.[5] Further, during the exam, petitioner admitted to using marijuana and amphetamines. Dr. Magaw opined that "although there was no frank, florid psychosis present, there does appear to be some underlying and significant mental disease present," and the doctor diagnosed petitioner as having an explosive personality.

---

**5.** Army records indicate that Dr. Morrell suggested expediting petitioner's discharge from the Army.

Dr. Kushner performed psychological testing to assist Dr. Magaw. Although testing revealed that petitioner may have been attempting to appear more mentally ill than he was, the doctor found that his explosive, unprovoked rages, and thinking patterns differed from "normal." Dr. Magaw wrote that "Mr. Boliek is suffering from a mental disease, although it is not a classic psychosis of the type that would have impaired his ability to recognize the full ramifications of his acts. We do feel that the patient is still suffering from a mental disease or defect ..." In addition, the doctors wrote that medication should be used to control petitioner's rages. In fact, while incarcerated for burglary, petitioner was prescribed Mellaril to reduce excitement, tension, and agitation.

Respondent argues that no prejudice was suffered by petitioner because some of the psychological reports show him to be a malingerer and contain other aggravating evidence. Therefore, the government argues, the jury would only have been inflamed by their admission.

First, this Court does not believe that the testimony would have worsened the perception of petitioner. "[T]he testimony would have put the aggravating evidence in context along with the mitigating evidence." *Kenley,* 937 F.2d at 1308. Next, the "unfavorable" reports contained omissions, incomplete test results, and mistakes. They could hardly be considered nonmitigating. *See Kenley,* 937 F.2d at 1308. For example, Dr. Parwatikar's 1979 report contained several errors. He commented that petitioner had been healthy throughout his life even after being told about his TB. In addition, he listed petitioner as having completed one year of college. Ms. Simpson, a Clinical Casework Assistant II, examined petitioner and additionally added incorrect information to his file.

Dr. Snow examined petitioner in 1980 as part of another pre-trial evaluation. She did find that petitioner was lying to her that his account of his personal history was confused. She, however, mostly concentrated on his criminal history and commented on his tattoos. She discounted his suicide attempts, his perceptual disturbances, and accounts of his past medical history. She only spent one and a half hours with petitioner but still diagnosed him as having an anti-social personality disorder with substance abuse.

Even assuming that Dr. Snow's report is unfavorable to petitioner, when it is compared to Dr. Magaw's report, it loses much weight. Dr. Kushner used several tests to evaluate petitioner, including the Minnesota Multiphasic Personality Inventory. Dr. Magaw considered past relevant records while Dr. Snow based her report on petitioner's recollections and the prosecutor's report. Dr. Snow did not even believe that petitioner had been prescribed and was taking Mellaril.

After his arrest for the murder of Jody Harless, petitioner was examined by Dr. Daniel at the Fulton State Hospital. Again, if the report would not have benefited petitioner at the mitigation stage, it certainly could have been challenged. Petitioner was only examined by a psychiatrist two times for an hour to an hour and twenty-five minutes each session. A clinical psychologist and a forensic team social worker also spent time with petitioner.

Dr. Daniel heavily cited Dr. Parwatikar's report from Farmington even though Dr. Parwatikar's evaluation was only a short one-day pre-trial examination and contained inaccuracies. Dr. Daniel also drew conclusions even though testing was not actually completed. Staff members recorded that petitioner was uncooperative and explosive making test results "invalid." No attempts were made to interpret these tests, but Dr. Daniels found that petitioner was malingering.

In May of 1984, petitioner was examined by Dr. Santos because he had attempted to injure himself in the Camden County jail. Dr. Santos agreed with Dr. Daniels and found that petitioner was malingering and that he did not suffer from psychosis or depression. While at the jail, however, petitioner continued to take medication. Jail records note that over 845 doses of Ativan, Dilantin, Darvocet, Percocet, and Percodan were prescribed over a three-month period, presumably to control tension, grand mal seizures and temporal lobe seizures, and pain.

Finally, the fact that these reports rule out mental disease or defect and incompetency "does not mean it rules out lesser but potentially mitigating conditions and disorders." *Kenley,* 937 F.2d at 1307. "[E]vidence of conditions, disorders and disturbances are precisely the kinds of facts which may be considered by a jury as mitigating evidence." *Id.* (citation omitted).

Although the jury would have heard aggravating information, this Court doubts that there would have been such a large impact as to totally destroy any positive impact of the mitigating evidence.

Petitioner's counsel has further provided this Court with a comprehensive psychiatric evaluation conducted by Dr. Logan. (Pet'r Ex. 9–13). This Court is convinced that if petitioner's trial counsel had been more aware of mitigating circumstances and had he been reasonably competent, he would have done further investigation that would have lead to further psychiatric examinations. *Kenley,* 937 F.2d at 1306.

Dr. Logan spent ten and a half hours with petitioner. He also reviewed medical and psychiatric records from 1963 to 1991, education information, and background information from petitioner's parents. Dr. Dysart and Dr. Swiercinsky assisted with testing.

A summary of the results are as follows: a brain MRI conducted by Dr. Dysart was interpreted as normal, but lack of coordination or coherence between the two frontal lobes of the brain resulted in slowed information processing. Dr. Dysart wrote that "[a]symmetric delta waves between the lateral anterior and medial temporal lobes were seen, which were consistent with ideational problems. A lack of coordination or coherence between the frontal lobes was noted, which can be seen in individuals with episodic disinhibited explosive behavior." He determined that the "findings were consistent with a major affective disorder, or episodes of mania."

The Millon Clinical Multiaxial Inventory test reflected "the presence of severe mental disorder...." It showed that petitioner was "depressed, anxious, moody, and prone to impulsive outbursts." It confirmed a strong pattern of drug abuse, and that his affect was "hypomanic, with an underlying mood of anxiety and depression."

Dr. Swiercinsky believed that the neuropsychological tests provided a number of "neurological soft signs" that could indicate organic brain damage. The doctor believed that petitioner's clinical diagnosis was consistent with an organic mental disorder, with explosive tendencies, and that he suffered from a personality disorder.

Dr. Logan summarized his evaluation by stating that petitioner "suffers from a number of emotional problems which have affected his adjustment, including his behavior at the time of the homicide of Ms. Harless. These emotional difficulties would qualify as a mental disease or defect." The following factors were considered:

1. A major affective disorder with episodes of depression and manic hyperactivity.

2. Significant childhood illness and a hearing difficulty.

3. Family history of alcoholism, including his father.

4. Family conflict, financial difficulty and frequent relocations.

5. Learning difficulties.

6. An attention deficit disorder.

7. Head injuries with subsequent seizures and severe headaches.

8. Cognitive deficits in processing information.

9. Episodic unprovoked attacks or rage and aggressive behavior.

10. Psychotic symptoms including intermittent hallucinations and delusional thinking.

11. Anxiety with panic attacks and anxiety related physical symptoms.

12. Significant substance abuse, including marijuana, alcohol, and stimulants such as amphetamines.

Dr. Logan's report confirms the long history of petitioner's problems. Had Sterling done minimal investigation, this crucial information could have properly been presented to the jury. Further, petitioner's case is well in

line with similar cases in which ineffective assistance of counsel has been found.[6]

Given the sympathetic light in which petitioner's past behavior could have been presented including his family and medical background, and given the evidence of medically significant conditions and disorders, suicidal tendencies, drug abuse and intoxication, this Court finds that it was unreasonable for counsel to have presented *no* mitigating evidence. This Court cannot say with absolute certainty how the jury would have considered the mitigating evidence, but they deliberated almost three hours without it. Counsel's performance is at least enough to undermine confidence in the outcome. For the reasons stated, this Court finds prejudice, and petitioner's sentence of death is overturned.

## II. Joint Liability Instruction

Petitioner next argues that the trial court improperly submitted a "joint liability" verdict directing instruction. He states that the use of the instruction violated his due process rights and that his appellate counsel was ineffective for not raising the issue on direct appeal. Respondent, however, argues that this Court is barred from reaching the merits of this issue, that direct appellate counsel was not ineffective, and that the verdict director was properly submitted.

### A. Procedural Bar

Petitioner does not dispute that he did not raise the joint liability instruction issue on direct appeal. He attributes this failure, however, to the ineffective assistance of his appellate counsel. Therefore, petitioner contends, his claim is not barred.

■ The only way to present an ineffective assistance of appellate counsel claim to a state court is through a motion to recall the mandate. *See Nave v. Delo,* 22 F.3d 802, 808–09 (8th Cir.1994); *Meaney v. State,* 629 S.W.2d 587, 588 (Mo.Ct.App.1981). Petitioner filed such a motion with the Missouri Supreme Court and requested that it review his ineffective assistance claim. (Pet'r Ex. 5 at 7). On July 23, 1991, the Missouri Supreme Court denied petitioner's motion, issuing an order which read, "[a]ppellant's motion to recall the mandate is overruled." (Pet'r Ex. 6).

■ The Eighth Circuit has found that when Missouri's Supreme Court denies a motion to recall the mandate without providing reasons for its decision, there is no independent and adequate state law basis for the denial. *Pollard v. Delo,* 28 F.3d 887, 889 (8th Cir.1994). As a result, this Court is not barred from considering the merits of petitioner's claim. *Id.*

### B. Merits

■ As outlined above, to prevail on an ineffective assistance of counsel claim, petitioner must show that appellate counsel's performance was constitutionally ineffective and that counsel's performance resulted in prejudice. *Kenley,* 937 F.2d at 1303 (citations omitted). The effectiveness of counsel must be evaluated in light of the circumstances in which she was called on to perform. *Pollard,* 28 F.3d at 889. In this case, trial counsel's new trial motion only generically argued that the trial court erred by not giving every defense instruction. (Resp't Ex. B at 199, 200). Trial counsel only chose to specifically address penalty phase Instruction number 19. *Id.* Faced with this situation, appellate counsel was not unreasonable in

---

**6.** *See Kenley v. Armontrout,* 937 F.2d 1298 (8th Cir.1991) (Court found ineffective assistance of counsel when little investigation was conducted and the following mitigating evidence existed: aggressive and hostile behavior as a child, states of uncontrollable rage, defensiveness, behavioral problems and fainting spells, suicide attempts, drug use, anxiety, early discharge from the military, troubled childhood including environmental instability, sleeping with a knife out of fear, and anti-social personality disorder); *Ford v. Lockhart,* 861 F.Supp. 1447 (E.D.Ark.1994) (sentence vacated after counsel failed to investigate and to present evidence of child abuse, intoxication, and history of mental illness). *See also Hitchcock v. Dugger,* 481 U.S. 393, 398, 107 S.Ct. 1821, 1824, 95 L.Ed.2d 347 (1987) (evidence consisting of family testimony, troubled and difficult background, prior criminal history or lack thereof, are admissible as mitigating evidence); *Eddings v. Oklahoma,* 455 U.S. 104, 113–16, 102 S.Ct. 869, 876–78, 71 L.Ed.2d 1 (1982) (facts about family background, personal history, emotional disorders, age emotional disturbance, beatings by one's father, and slow mental development are admissible mitigating evidence).

abandoning the joint liability issue. *See Layton v. Pendleton,* 864 S.W.2d 937, 940 (Mo. Ct.App.1993) (allegations in a new trial motion must be sufficiently definite as to direct the trial court to specific rulings, and the rule requiring the making of specific objections to instructions must be strictly enforced).

Further, less than a month after petitioner's conviction, the Missouri Supreme Court addressed the constitutionality of the same joint liability instruction. *State v. Johns,* 679 S.W.2d 253, 259 (Mo.1984) (en banc) *cert. denied,* 470 U.S. 1034, 105 S.Ct. 1413, 84 L.Ed.2d 796 (1985). The court found that only a small amount of evidence tending to show conspiracy was necessary to support the submission of the joint liability instruction. *Johns,* 679 S.W.2d at 260. Petitioner argues that there was absolutely no evidence presented at trial that he aided and abetted Vernon Waite (Waite) in the killing of Jody Harless, however, this Court disagrees. Aside from the testimony of Jill Harless that she saw both men standing over the victim, petitioner testified that he called the victim's name and then pulled the trigger. (Resp't Ex. A at 461 [hereinafter Tr.]) Petitioner did testify that the first shot was an accident and that it was Waite who fired the fatal shot, but he also testified that Waite took the gun from him, removed a shotgun shell from his belt, and shot Jody Harless without interference from him. *Id.* at 463. In light of the Missouri Supreme Court decision and the evidence presented at trial, appellate counsel would have had little chance of succeeding on the joint liability issue.

Because this Court must be guided by a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *Strickland v. Washington,* 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984), and because the "winnowing of the issues to eliminate a sure loser is the kind of performance that courts expect from competent counsel," *Horne v. Trickey,* 895 F.2d 497, 500 (8th Cir.1990), this Court must find that appellate counsel's performance did not fall below an objectively reasonable level in this instance. In addition, the use of the joint liability instruction

did not so infect the trial with unfairness as to violate petitioner's due process rights.

### III. Tattoo Evidence

Petitioner's next claim is that the admission of tattoo evidence and the prosecutor's arguments relating to the tattoo violated his due process rights. Further, he states that trial counsel's failure to object to the tattoo's introduction constituted ineffective assistance of counsel.

### A. Procedural Bar

Like petitioner's mitigating evidence claim, the tattoo issue was not raised at the Rule 27.26 hearing. As established above, however, the trial court's actions surrounding that hearing provided cause to lift the procedural bar. Again the prejudice is evident—petitioner was prohibited, and thus subsequently barred, from raising a meritorious claim. The analysis below will further demonstrate the prejudice and support the lifting of the procedural bar.

### B. Merits

 Petitioner has a tattoo of a smoking double-barrelled shotgun on his back with the inscription "Death Dealer" beneath it. The prosecution used the tattoo as a theme throughout its case. Testimony about the tattoo was elicited from three key witnesses during prosecution's case-in-chief and was highlighted in closing argument.

First, the prosecutor asked Officer Beggs if petitioner, "had any identifying marks about him that [he] saw?" (Tr. at 262). After the officer answered that petitioner had several tattoos, he was further asked, "was there any one in particular that you did notice?" *Id.* Beggs responded, "a double barrelled shotgun that had smoke coming from the barrel." *Id.* at 263. Then the shotgun was strategically introduced into evidence. *Id.*

Next, during the questioning of Officer Haywood, the government again asked if petitioner had any identifying marks. *Id.* at 269–70. Officer Haywood described a tattoo of a double-barrelled shotgun with some smoke coming out of it. *Id.* at 270. The

question came at the end of the direct examination. Finally, the tattoo was discussed during the testimony of the government's key witness, Jill Harless. Again the prosecution emphasized the tattoo, waiting until the end of questioning to ask if petitioner had anything distinguishing about him. *Id.* at 325. Harless testified that he had a tattoo of a gun on his back with the words "Death Dealer" beneath it. *Id.*

The government carried its tattoo theme through the end of the trial. The last words the jury heard before deliberation were:

> You know Jeffrey Pittman is important, and I don't mind talking about tattoo [sic], because lots of people have tattoos, but you know, there's something curious what Jeff Pittman said and the tattoo, because Jeff Pittman said, "If I'm guilty, if something happens to me, you know who did it." And what did Jeff Pittman say? He inferred that to be Ted. Jody Harless said, "Ted may blow my head off." *And the tattoo was a shotgun with smoking coming out of it that says, "Death Dealer", and you know, you tie those things together and they all came true.* If something happened to Jody Harless, Ted Boliek killed her. Jody Harless, one of her last words was "Ted Boliek's gonna blow my head off." And he did it. *And Ted Boliek writes on his body and prints for everyone to see that he's "Death Dealer" and then he did it,* and Ted Boliek is guilty of capital murder and deserves no sympathy from you. Thank you. [emphasis added]

*Id.* at 553.

Petitioner argues that trial counsel was ineffective for failing to object to the tattoo evidence and to prosecution's arguments involving it. In order to convince this Court, petitioner must demonstrate that counsel's failure fell below an objectively reasonable standard and that the failure prejudiced him. *Strickland v. Washington,* 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674 (1984).

This Court finds that evidence regarding petitioner's tattoo was totally irrelevant, and that the jury should not have heard testimony or argument about it. Respondent implies that it was properly admitted under Federal Rule of Evidence 404(b). Rule

404(b), however, applies to character evidence of "other crimes, wrongs, or acts." A tattoo is not a crime or a wrong. Further, it does not fall under any exception provided by the rule because the tattoo was not used to show "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed.R.Evid. 404(b).

Respondent's reliance on *State v. Hubbard* and *State v. Skinner* is misplaced. In *Hubbard,* evidence of the defendant's tattoos was relevant as corroboration of a witness' identification of the defendant. *State v. Hubbard,* 659 S.W.2d 551, 559 (Mo.Ct.App.1983) (a court should always be hesitant to exclude any evidence which tends to aid and support identification in an eye-witness case). In *Skinner,* the defendant disputed his authorship of threatening letters written after a murder. *State v. Skinner,* 734 S.W.2d 877, 882–83 (Mo.Ct.App.1987). The court found that testimony as to whether defendant had tattoos similar to a symbol on the letters was admissible to prove authorship, in absence of any direct evidence on that issue. *Id.*

There was no issue of identity in petitioner's case. He never disputed the fact that he was present when Jill Harless was killed. The only reason the government sought to introduce the tattoo evidence was to inflame the jury and to show that petitioner acted in conformity with the tattoo. This is just the type of connection that the Federal Rules of Evidence seek to prohibit by preventing the introduction of irrelevant character evidence. *See Dawson v. Delaware,* 503 U.S. 159, 166, 112 S.Ct. 1093, 1098, 117 L.Ed.2d 309 (1992) (evidence of defendant's membership in the Aryan Brotherhood constitutional error where his membership was not relevant to any of the issues being decided in the proceeding); *United States v. McBride,* 862 F.2d 1316, 1319 (8th Cir.1988) (questioning of defendant's former girl friend as to why she broke up with defendant, as well as girl friend's response that she was tired of him beating her, constituted plain error; question did not relate to defendant's guilt); *State v. Ellis,* 820 S.W.2d 699, 702 (Mo.Ct.App.1991) (evidence that defendant was a homosexual was inadmissible in prosecution for deviate sexual assault; it was an attack on the char-

acter and reputation of the defendant); *McKinney v. Rees,* 993 F.2d 1378, 1380–1383 (9th Cir.1993) (admission of emotionally charged evidence of a knife collection and an image of a man who sat in dormitory room sharpening knives, scratching morbid inscriptions on wall, and occasionally venturing forth in camouflage with knife strapped to his body was not relevant to issues in trial and therefore improperly admitted); *Bellmore v. State,* 602 N.E.2d 111, 127 (Ind.1992) (capital murder defendant's tattoo showing knife with dripping blood could not be relied upon as nonstatutory aggravator justifying death sentence).

This Court finds that trial counsel's failure to object to this tattoo evidence fell below a reasonable standard of performance. No reasonable attorney would have failed to object. Trial counsel Sterling, himself, admitted the grave error. During deposition he commented that he did not object to the admission of the evidence during the guilt or the penalty phase because, "he did not have presence of mind to object." (Sterling at 54–56). He admitted, however, that the arguments were objectionable and that it would have been appropriate for him to have objected. *Id.*

■ Petitioner also suffered prejudice. The tattoo evidence and government's arguments were highly prejudicial especially in light of the other evidence presented in the prosecution's case. *See Elledge v. Dugger,* 823 F.2d 1439, 1447 (11th Cir.1987) (citation omitted) (it is appropriate for a reviewing court to consider the strength of the case presented in deciding whether additional evidence would have changed a trial's outcome). Jill Harless testified that she did not see petitioner shoot the victim. There was no physical evidence connecting petitioner to the crime. All the evidence pointing to petitioner as the shooter was circumstantial. The tattoo evidence labeled petitioner a "Death Dealer," a characterization that the defense had little chance to overcome.

Further, the jury was tainted with this evidence during the penalty phase. Not only were jurors aware of the tattoo evidence and

arguments from the trial, but they were again reminded of it during the penalty phase. The jury could have easily been influenced by the tattoo evidence in determining that petitioner killed Jody Harless to prevent her from testifying against him—the only aggravating circumstance the jury found. It may have also influenced their thoughts about petitioner's character, mind set and other such factors. This prejudicial evidence may have had an even greater impact at this stage than at the guilt stage.

This Court finds that trial counsel was ineffective. His performance and the prejudice petitioner suffered as a result of his performance undermine this Court's confidence in the outcome of the trial and of the penalty phase. Accordingly, petitioner's capital murder conviction is set aside and his sentence of death is vacated.

## IV. Exculpatory Letters

The next issue raised by petitioner involves his trial counsel's failure to investigate and to utilize during cross-examination several letters written by Jill Harless. Respondent argues that this Court is procedurally barred from reaching the merits of the issue and additionally, that it was reasonable for counsel to prevent the contents of the letters from reaching the jury.

### A. Procedural Bar

Although this issue was raised during the Rule 27.26 hearing, it was abandoned on appeal. Petitioner is precluded from using an ineffective assistance of counsel argument to overcome the procedural bar. *See Coleman v. Thompson,* 501 U.S. 722, 752–53, 111 S.Ct. 2546, 2566, 115 L.Ed.2d 640 (1991) (no right to counsel in either state or federal post-conviction relief proceedings). Petitioner argues, however, that the bar must be lifted in order to avoid a fundamental miscarriage of justice.

■ The miscarriage of justice standard was recently clarified in *Schlup v. Delo,* —— U.S. ——, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). The Court held "that the *Carrier*[7] 'probably resulted' standard rather than the

**7.** *Murray v. Carrier,* 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986).

more stringent *Sawyer* [8] standard must govern the miscarriage of justice inquiry when a petitioner who has been sentenced to death raises a claim of actual innocence to avoid a procedural bar to the consideration of the merits of his constitutional claims." *Id.* —— U.S. at ——, 115 S.Ct. at 867. The *Carrier* standard "requires the habeas petitioner to show that 'a constitutional violation has probably resulted in the conviction of one who is actually innocent.'" *Id.* (quoting *Carrier*, 477 U.S. at 496, 106 S.Ct. at 2649–2650.) To establish the requisite probability, the petitioner must show that "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Id.*

■ The letters written by Jill Harless to petitioner contain assertions that Waite was "the one who pulled the trigger" and that she was frightened about the possibility of facing the death penalty. (Pet'r Ex. 18). The letters also discuss plea bargain agreements proposed by the government. *Id.* Although on their face the letters appear to be very damaging to the prosecution's case, if they are taken in light of the other evidence that could have been presented at trial, their impact is significantly weakened.

For example, Jill Harless testified under oath that she had written the letters claiming that Waite was the shooter at petitioner's request. (Resp't Ex. F at 111). At trial, the state brought out evidence that petitioner had written Jill Harless a letter in which he claimed to be surprised to learn that Jody Harless was dead. Petitioner, however, testified that he fired the first shot in front of Jill Harless and that he saw Waite fire the fatal shot. The testimony would have given the appearance that Jill Harless' letters professing petitioner's innocence were merely a sham. Further, the letters are somewhat inconsistent with petitioner's defense at trial because they point to Waite as the only shooter.

Even if the letters could have been used to damage Jill Harless' credibility at trial, a reasonable juror could have still found petitioner guilty beyond a reasonable doubt.

This Court finds that petitioner cannot meet the narrow "actual innocence" standard, and therefore, this Court is prohibited from addressing the merits of his claim.

## V. Psychiatric Expert

Petitioner next complains that the trial court's denial of his motion for the appointment of a psychiatric expert violated his constitutional rights. He further argues that appellate counsel provided ineffective assistance when she failed to raise the issue on direct appeal. Respondent argues that this issue is procedurally barred and that counsel was reasonable in not arguing the issue on appeal.

### A. Procedural Bar

Because Missouri's Supreme Court denied petitioner's motion to recall the mandate without providing reasons for its decision, there was no independent and adequate state law basis for the denial. *Pollard v. Delo*, 28 F.3d 887, 889 (8th Cir.1994).

Therefore, this Court may consider the merits of petitioner's claim. *Id.*

### B. Merits

■ Petitioner asserts that he has satisfied the performance prong of the *Strickland* standard because any reasonable attorney would have raised the denial of his motion for psychiatric expert on direct appeal. This Court agrees.

In *Ake v. Oklahoma* (decided while petitioner's conviction was on direct appeal) the Supreme Court held that "when a defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, the Constitution requires that a State provide access to a psychiatrist's assistance on this issue if the defendant cannot otherwise afford one." 470 U.S. 68, 74, 105 S.Ct. 1087, 1091–92, 84 L.Ed.2d 53 (1985). The Court went on to explain the special significance of a psychiatric exam to the penalty phase. "Without a psychiatrist's assistance, the defendant cannot offer a well-informed expert's opposing view, and thereby loses a significant opportu-

---

**8.** *Sawyer v. Whitley,* 505 U.S. 333, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992).

nity to raise in the jurors' minds questions about the State's proof of an aggravating factor." *Id.* 470 U.S. at 86, 105 S.Ct. at 1097. The Court found that due process required access to a psychiatric examination to assist in the preparation of the sentencing phase. *Id.*

Appellate counsel's performance fell below an objective standard of reasonableness when she failed to raise this issue on direct appeal. Any reasonable attorney would have discovered the trial court's error and would have addressed it. After a simple review of the trial record, counsel should have noted that no mitigating evidence was presented on petitioner's behalf and that a contributing factor to this absence of evidence was the trial court's decision to withhold a psychiatric examination. *See State v. Boliek,* 706 S.W.2d 847, 851 (Mo.1986) (en banc). In addition, a competent attorney would have realized the essential nature of mitigating evidence, especially evidence of mental or emotion defect, disturbance, or disorder—the most common and important of elements. *See Eddings,* 455 U.S. at 113–16, 102 S.Ct. at 876–78; *Kenley,* 937 F.2d at 1307. The *Ake* decision clearly established that the ability to present mitigating evidence or to rebut aggravating factors at the sentencing phase is essential. 470 U.S. at 86, 105 S.Ct. at 1097.

Respondent argues that counsel was reasonable in failing to raise this issue because *Ake* limited criminal defendants to one psychiatric exam and petitioner had already received two. *Ake,* 470 U.S. at 70, 105 S.Ct. at 1094; (Pet'r Ex. 21–23). The examinations received were conducted solely to determine competency to stand trial. No tests or discussions were conducted to investigate mitigating factors. The *Ake* decision highlighted the fact that the ability to present mitigating evidence is just as important as the ability to present a proper insanity defense. 470 U.S. at 86, 105 S.Ct. at 1097. Petitioner was denied that right, and counsel should have protested the violation to the Missouri courts. The first prong of *Strickland* is met.

Counsel's performance also prejudiced petitioner. In light of *Ake* and of the extensive mental problems and disorders suffered by petitioner[9], the Missouri Courts would have been forced to overturn the petitioner's sentence of death. *See Loyd v. Whitley,* 977 F.2d 149 (5th Cir.1992) (defense counsel's failure to obtain independent psychological analysis of defendant to present during sentencing phase of capital murder trial was not professionally reasonable and defendant was prejudiced); *Liles v. Saffle,* 945 F.2d 333 (10th Cir.1991) (trial court deprived defendant of due process by denying his pretrial motion for state funds to employ psychiatrist in aid of his defense); *Castor v. Indiana,* 587 N.E.2d 1281 (Ind.1992) (death sentence overturned because of trial count's failure to appoint psychologist to examine defendant for mitigating circumstances).

Further, had the trial court allowed petitioner to be examined, mitigating evidence would have been presented to the jury, and the jury would probably not have sentenced petitioner to death. The mental disorder evidence alone is strong enough to undermine this Court's confidence in the outcome. For the above reasons, this Court grants movant's habeas petition on this issue, and the sentence of death is vacated.

## VI. Hearsay Statements

Petitioner's next argument involves statements made by the victim before her death that were introduced through witness testimony at trial. Petitioner claims that because prosecution witnesses were allowed to testify about these statements, his rights under the Confrontation Clause of the Sixth Amendment were violated. This issue was properly preserved on appeal, and therefore, this Court may directly address the merits of petitioner's claim.

The testimony petitioner complains about came from Jeffrey Pittman (Pittman) and Thomas K. Sutton (Sutton). They were allowed to testify, over objection, that Jody Harless stated that she "was afraid of Ted," that "he was gonna come and blow her head off," and that she was scared of petitioner and Waite. (Tr. at 280, 400). The Missouri Supreme Court determined that this evidence was admissible, limiting this Court to

---

9. Described in Part I of this Order.

the determination of the Confrontation Clause issue. *See Estelle v. McGuire,* 502 U.S. 62, 67, 112 S.Ct. 475, 480, 116 L.Ed.2d 385 (1991) (it is not province of federal habeas court to re-examine state court determination on state law questions); *Byrd v. Armontrout,* 880 F.2d 1, 9 (8th Cir.1989) (the admissibility of evidence is a matter of state law; the Missouri Supreme Court has the final say on questions of Missouri law).

▮ The United States Supreme Court has found that the Confrontation Clause was intended to exclude some hearsay. *Ohio v. Roberts,* 448 U.S. 56, 63, 100 S.Ct. 2531, 2537, 65 L.Ed.2d 597 (1980). When a declarant is unavailable, his or her statement is only admissible, "if it bears adequate 'indicia of reliability.'" *Id.* 448 U.S. at 66, 100 S.Ct. at 2539. "[R]eliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness." *Id.*

▮ Petitioner argues that the hearsay statements did not fall within a firmly rooted hearsay exception. He asserts that respondent's reliance on *State v. Singh,* 586 S.W.2d 410 (Mo.Ct.App.1979) and *Lenza v. Wyrick,* 665 F.2d 804 (8th Cir.1981) is improper. In *Lenza,* the Court found that there was no Confrontation Clause violation because testimony of hearsay statements made by a murder victim and the victim's mother were admissible under the "state of mind" exception to the hearsay rule. 665 F.2d at 810 (8th Cir.1981). In *Singh,* the court found that although the factors which make a homicide victim's state of mind relevant may be numerous, courts have developed three well-defined categories in which the relevance of statements of fear can be established. 586 S.W.2d at 419. These categories are the defenses of self-defense, suicide, and accidental death. *Id.* The *Singh* Court also held, however, that "declarations revealing a state of mind often contain recitals of circumstantial facts. They are not admissible to prove

the truth of such recitals." *Id.* 586 S.W.2d at 418.

The "accident defense" was injected into the trial, but petitioner testified that he fired the first, *non-fatal* shot as an accident. He claimed that the fatal shot was fired by Waite and that Waite's shot was clearly not an accident. The state of mind exception is not easily applied in this case. Furthermore, this Court agrees with Justice Marshall's dissent to the Supreme Court's denial of certiorari in which he wrote that the government was not using these hearsay statements to show the victim's state of mind. *See Boliek v. Missouri,* 479 U.S. 903, 107 S.Ct. 302, 93 L.Ed.2d 276 (1986) (Marshall J. dissenting). Justice Marshall wrote, "[t]here can be no doubt, given the use made of the evidence by the State in summation,[10] that the testimony as to the victim's statements was admitted to prove not her state of mind, but the truth of her belief that petitioner intended to kill her. Under these circumstances, I do not believe that the evidence in this case was admitted under a 'firmly rooted' hearsay exception." *Id.*

The analysis cannot end at this point, however, for this Court must determine whether the hearsay statements bore other "indicia of reliability" such as some "particularized guarantees of trustworthiness." *See Ohio,* 448 U.S. at 65, 100 S.Ct. at 2539. The statements were made to two witnesses at different times. (Resp't Ex. A1, A2). Jody Harless knew both of the victims and spoke with them frequently.[11] *Id.* In addition, witnesses heard Waite discussing the killing with petitioner, and petitioner testified that his decision to leave Kansas City was prompted by the fact that police wanted to speak to the victim. *Id.* This Court finds that there was sufficient indicia of reliability to make the hearsay statements admissible under the Confrontation Clause. The petition for habeas relief is denied on this issue.

## VII. Mitigating Evidence Instruction

Petitioner next argues that the mitigating evidence instruction read at trial improperly

---

**10.** *See* Part III of this Order.

**11.** Pittman was the victim's boyfriend and Sutton stayed in the same house with her.

required the jury to agree unanimously upon whether a mitigating circumstance existed before they could weigh it against aggravating circumstances. Petitioner further contends that trial counsel was ineffective for not objecting to the use of the instruction and that appellate counsel was ineffective for not raising the issue on direct appeal.

The jury was instructed:

If you unanimously decide that a sufficient mitigating circumstance or circumstances exist which outweigh the aggravating circumstance or circumstances found by you to exist, then you must return a verdict fixing defendant's punishment and imprisonment for life ... without eligibility for probation or parole until he has served a minimum of fifty years of his sentence.

(Tr. at 594). The Eighth Circuit specifically addressed petitioner's argument in *Battle v. Delo,* 19 F.3d 1547 (8th Cir.1994). Like petitioner, Battle argued that the same instruction violated the holdings in *Mills v. Maryland,* 486 U.S. 367, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988), and *McKoy v. North Carolina,* 494 U.S. 433, 110 S.Ct. 1227, 108 L.Ed.2d 369 (1990). Although the Eighth Circuit found that Battle's argument was procedurally barred, the court went on to address the merits of his claim and found that Battle had "failed to show that there is a reasonable likelihood that the jury misconstrued the instructions as to make the sentencing decision improper." *Battle,* 19 F.3d at 1562. The Court held that the instruction was not constitutionally infirm because the "Missouri instructions did not lead the jury to the inescapable conclusion that it must unanimously agree that there were mitigating circumstances before it could fix life in prison as Battle's punishment." *Id.*

This Court is bound by Eighth Circuit precedent, and therefore, denies the petition for habeas on this issue.

## VIII. Pressured Testimony

■ Petitioner also asserts that his due process rights were also violated when the trial court denied his motion for continuance at the close of the state's evidence. This issue was preserved on appeal and is properly before this Court.

The government's case ended at 3:30 on the second day of trial. At that point, counsel for petitioner asked for an overnight continuance so that he could prepare petitioner to testify. (Tr. at 417–18). The trial court denied the motion and the following exchange occurred in front of the jury:

Court: Court will reconvene from recess. Is Defense ready to proceed?

Counsel: No, Your Honor, I refuse to proceed any further in this case under the circumstances.

Court: All right, the Court will show that the Defense is offering no evidence.

Counsel: Your Honor, may it please the Court, I would like the record to reflect that the Defense is not offering no evidence. It's simply a fact that at this point in time we are not prepared with the evidence that we should go that we ah ... was [sic] going to offer and the Court has not allowed us time to prepare that evidence and therefore we cannot present the evidence.

(Tr. at 422). The next day, the court changed its ruling and petitioner was allowed to testify, but petitioner asserts that because the jury heard the court's comments, his rights were violated.

■ The law is clear—the appropriateness of a continuance is a discretionary matter for the trial court. *Citizens Bank v. Ford Motor Co.,* 16 F.3d 965, 966 (8th Cir. 1994); *State v. Jordan,* 646 S.W.2d 747, 753 (Mo.1983) (en banc). Although some blame rests with the trial court for allowing this unfortunate discussion to occur in front of the jury, in light of the additional evidence presented at trial, this Court cannot say that the conversation "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *See Donnelly v. DeChristoforo,* 416 U.S. 637, 643, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974). Accordingly, this Court finds that petitioner's due process rights were not violated, and his request for relief must be denied on this issue.

## IX. Proportionality Review

This Court now turns to petitioner's claim that Missouri's death penalty statute, as applied to him, was unconstitutional. At the heart of this argument is petitioner's assertion that the Supreme Court of Missouri's proportionality review was improperly conducted, and therefore, his death sentence was excessive or disproportionate when compared to other similar cases.

Under Missouri law, the Missouri Supreme Court comparatively reviews verdicts in which capital punishment is imposed instead of imprisonment for life. Mo.Ann.Stat. § 565.014 (Vernon 1979) (repealed and replaced with Mo.Ann.Stat. § 565.035 in 1983). In this case, the Missouri Supreme Court conducted a proportionality review similar in form to that conducted in *State v. Foster*, 700 S.W.2d 440, 444-445 (Mo.1985) (en banc). Missouri's review procedure has been approved by the Eighth Circuit Court of Appeals. *Foster v. Delo*, 39 F.3d 873, 882 (8th Cir.1994).

Further, the jury found that petitioner killed Jody Harless to prevent her from testifying in a judicial proceeding. Missouri Supreme Court could reasonably determine that the death penalty was appropriate. Therefore, petitioner's request for habeas relief is denied on this issue.

## X. Aggravating Circumstance

■ Petitioner next questions the constitutionality of the statutory aggravating circumstance that was found to apply to him. During the penalty phase, the jury determined that petitioner killed Jody Harless to prevent her from testifying in "any judicial proceeding." Mo.Rev.Stat. § 565.012.2(12) (1982 Supp.). Petitioner asserts that this circumstance is vague and overbroad because it allows for the application of a death sentence without proof that a judicial proceeding is set.

The same argument was submitted to the Missouri Supreme Court in *State v. Williams*, 652 S.W.2d 102, 112-13 (Mo.1983) (en banc). This Court agrees that the circumstance is not unconstitutionally vague and that there is no requirement that the witness/victim be scheduled to testify or has already testified. *Id.* Petitioner's habeas petition must be denied on this issue.

## XI. Notice of Criminal Record

Mo.Ann.Stat. § 565.005.1 (Vernon 1978 & Supp.1995) dictates that a criminal defendant must be given notice of evidence to be used as aggravating circumstances. Petitioner complains that his constitutional rights were violated because he was not provided notice that his criminal record would be used during the penalty phase. This Missouri statute did not become effective, however, until October 1, 1984. Because petitioner's trial occurred in September of 1984, he has not stated a claim upon which relief can be granted.

## XII. Reverse *Witherspoon*

■ Pursuant to *Witherspoon v. Illinois*, during voir dire, all jury panel members were asked about any views against the death penalty. 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). Petitioner's trial counsel failed, however, to ask the first group of jurors if they had any bias in favor of the death penalty. (Tr. at 54). Of the twelve jurors and two alternate jurors, six were from this first group. Petitioner argues that as a result, his constitutional right to a fair and impartial jury was denied. In addition, he contends that appellate counsel's failure to raise this issue on direct appeal constituted ineffective assistance of counsel.

Even if the procedural bar could be properly avoided, petitioner has not convinced this Court on the merits of his argument. Because it must be presumed that jurors follow instructions, *California & Hawaiian Sugar Co. v. Kansas City Terminal Warehouse Co., Inc.*, 788 F.2d 1331, 1334 (8th Cir.1986), and because petitioner's contention is too speculative to show prejudice, this Court must find against him on this issue.

## XIII. Prosecutorial Misconduct

The final issue raised by petitioner is his that prosecutorial misconduct violated his due process rights. He argues that this Court may address the substance of the issue because his trial counsel provided ineffective assistance by failing to object to the improp-

er arguments. Because a cumulative error argument may not result in habeas relief, each of petitioner's claims must stand on its own. *Scott v. Jones,* 915 F.2d 1188, 1191 (8th Cir.1990) (citations omitted).

### A. Procedural Bar

Petitioner's allegation of ineffective assistance of trial counsel was not raised during the Rule 27.26 hearing. In Part I.A., this Court determined that cause existed for the lifting of the procedural bar. Therefore, this Court will proceed in considering the merits of petitioner's claims.

### B. Merits

#### 1. Victim Impact Statement

■ During the penalty phase, the prosecutor made the following remarks:

> Her [Jody Harless'] family will never get over this crime as long as Ted Boliek's around to remind them, not just Jill Harless, but her brothers who came to see the trial. They will know that he's still alive and they will never get over this as long as he's alive, and remember this, and they will feel vindicated, I believe, if you take this step. (Tr. at 581).

The United States Supreme Court determined that the Eighth Amendment does not act as a *per se* bar to the use of such statements in closing argument. *Payne v. Tennessee,* 501 U.S. 808, 827, 111 S.Ct. 2597, 2609, 115 L.Ed.2d 720 (1991). Only if statements are so "unduly prejudicial" that they render the trial fundamentally unfair, does the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief. *Id.* 501 U.S. at 825, 111 S.Ct. at 2608 (citation omitted).

This Court finds that the closing argument did not render the trial fundamentally unfair. The statements fell within the parameters set out in *Payne. Id.* 501 U.S. at 828, 111 S.Ct. at 2609 (testimony that child of murder victim missed his mother and baby sister was proper). As a result, petitioner suffered no prejudice and the procedural bar cannot be avoided.[12]

#### 2. Hearsay Argument

The Court addressed the impact of the government's argument in Part VI of this Order.

#### 3. Tattoo Argument

The Court addressed the impact of this argument in Part III of this Order.

#### 4. Deterrence Argument

During the penalty phase, the prosecutor made the following statements:

> But I think if we have some protection in society, we do protect life, if we do think life is sacred, then we have to do sometimes those things we don't want to do, and there's several reasons why I think it's important. One of them is the deterrent. (Tr. at 579).

> This is our community's act of self defense. We are defending ourselves from the thugs who have taken over our streets. They don't care about other people. This is our community's self defense, defending it against those who would do this type of crime, and so it is appropriate in some circumstances. (Tr. at 581).

> Then we have a lot of thugs and muggers and killers in our society that are taking over our streets. We used to be able to go to the park. We use to be able to enjoy ourselves, but we are becoming prisoners in our homes because we haven't told these people, there is a risk to crime. (Tr. at 583).

The United States Supreme Court has held that it is permissible for a party to argue the penological rationales for imposing the death penalty, including the deterrence rationale.

---

12. Petitioner further objects to the prosecutor's argument that the victim's father would have been justified in killing petitioner if he had seen petitioner about to fire the fatal shot. Petitioner argues that the hypothetical confused the jury and persuaded them to believe that the father could have shot petitioner after he had fired the final shot. This Court disagrees. The prosecutor clearly stated that the victim's father would have been justified if he saw petitioner "about to pull that trigger." (Tr. at 580). This Court will not assume that the jury could not understand the plain meaning of the argument.

*Coleman v. Brown,* 802 F.2d 1227, 1239 (10th Cir.1986) (citations omitted). In light of this holding and the substance of the evidence presented at trial, petitioner did not suffer any prejudice from the use of this closing. This Court must therefore deny petitioner's request for relief on this issue.

5. Testimony Preparation Argument

The prosecutor's closing argument at trial made reference to a request for a continuance so that petitioner could prepare to testify.[13] The prosecutor argued:

> Here's a man who's gonna take his lies and fit 'em, and he had plenty of time. He needed plenty of time yesterday and today to prepare his testimony, even though he had months and months to do so and had known what the evidence was many times. (Tr. at 547).

These statements were clearly improper. However, because of the brevity of the comment and because of the weight and substance of the evidence already presented to the jury, this Court is not convinced that petitioner suffered any prejudice. Therefore, even if the procedural bar was properly lifted, petitioner's claim of ineffective assistance of counsel must be denied.

### Conclusion

For the above stated reasons, this Court holds that petitioner's petition for writ of habeas corpus will be conditionally granted.

Accordingly, it is hereby

ORDERED that William T. Boliek's writ of habeas corpus is conditionally granted. This conditional issuance of the writ shall become unconditional and permanent unless the State of Missouri commences proceedings to afford petitioner a trial within sixty (60) days of the date of this Order.

---

13. See Part VIII of this Order.